IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TIMOTHY A. GILKERSON, | |
| Plaintiff, | 8:15-CV-37 |
| vs. | MEMORANDUM AND ORDER |
| NEBRASKA COLOCATION CENTERS, L.L.C., | |
| Defendant. | |

    The plaintiff, Timothy Gilkerson, is suing his former employer, Nebraska Colocation Centers, L.L.C. (NCC), for allegedly breaching Gilkerson's employment contract. NCC contends the contract was validly rescinded by the parties, but Gilkerson claims the rescission is void due to duress. This matter is before the Court on the defendant's motion for summary judgment (filing 48). The defendant's motion will reluctantly be granted.

BACKGROUND

    Gilkerson was hired in 2011 to be NCC's Vice President and General Manager. Filing 49 at 1.[1] Gilkerson and NCC agreed to a 10-year employment contract, paying Gilkerson an annual base salary of $84,000, quarterly sales bonuses, and a retirement bonus upon the expiration of Gilkerson's employment period. Filing 51-2 at 1; filing 55 at 9. Gilkerson was responsible for developing NCC's information technology infrastructure. Filing 49 at 1-2. The parties disagree about the extent to which Gilkerson was expected to help with NCC's sales, and his commissions under the employment contract were based on the company's sales, not his. Filing 49 at 2; filing 55 at 2.

    The employment contract provided that if NCC terminated Gilkerson's employment without cause before the 10-year term expired, Gilkerson would

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1).

receive his remaining salary for the balance of the term in a lump sum, another 5 years' bonuses, and his full retirement bonus. Filing 51-2 at 5-6. But if Gilkerson were to be terminated with cause, he would receive only his unpaid compensation for services already performed. Filing 51-2 at 6. As relevant, "cause" for termination could include Gilkerson's "willful misconduct" in carrying out his duties; or "persistent failure to perform the duties and responsibilities of his employment hereunder; which failure is not remedied by him within 30 days after [his] receipt of written notice from [NCC] of such failure." Filing 51-2 at 4.

NCC was evidently unhappy about Gilkerson's performance helping with sales, and NCC's president, Jerry Appel, talked with Gilkerson about how he wanted Gilkerson to "[c]lose more deals." Filing 51-1 at 11. Gilkerson's performance review was generally average to positive, except for "[u]nsatisfactory" ratings in "[a]chieves sales goals" and "[f]ulfills the terms of his contract." Filing 57-4 at 2. The review indicated that Gilkerson's "lack of sales is irrefutable and of great concern[,]" and detailed Gilkerson's alleged failings in sales. Filing 57-4 at 3. Gilkerson signed the review on February 5, 2013, acknowledging its receipt. Filing 57-4 at 4. Gilkerson's comments on the review express his disagreement regarding sales goals, generally explaining that his experience was not in sales and that "except in the startup phase when everyone needed to pitch in and wear many hats[,]" he had understood that sales would be the responsibility of a dedicated sales team. Filing 57-4 at 4-5.

Appel announced the hiring of a new "Vice President – Sales and Marketing" on July 8, 2013. Filing 57-5 at 1. On the same day, Appel told Gilkerson that Gilkerson's office was to be given to the new hire, and that Gilkerson's job title had been changed to "Director: Field Engineering and Channel Services." Filing 57-5 at 3. Gilkerson was also informed that Appel was "developing a new compensation program for [his] new position. It [would] retain [his] salary at the current level, provide incentives for channel and carrier sales, and bonuses for field engineering and product development." Filing 57-5 at 3. Then, on July 15, 2013, Appel met with Gilkerson and presented Gilkerson with a document captioned "Mutual Rescission," which would rescind Gilkerson's employment contract. Filing 49 at 4; *see* filing 51-5. Gilkerson was also presented with a "term sheet" setting forth proposed terms of Gilkerson's continued employment. *See* filing 51-6.

Although Gilkerson contends he was given different term sheets at different times, it is clear that the term sheet he ultimately signed provided Gilkerson with the same base salary as the employment contract, a higher commission rate, and an additional bonus contingent upon certain goals. Filing 51-6; filing 57-3 at 4; *see* filing 57-8. But it limited calculation of

commission to Gilkerson's "customers" as defined by the term sheet, and did not include the retirement bonus. Filing 51-6. And the term sheet did not prohibit Gilkerson's termination. Filing 51-6.

Gilkerson did not immediately agree to the rescission and term sheet. *See* filing 49 at 5. He met with Appel again on July 17, 2013. Filing 49 at 5. Both meetings were recorded. *See* filing 57-6.[2] During the meetings, Appel was sharply critical of Gilkerson's performance. *E.g.* filing 57-6 at 3-6, 10, 23, 30. Appel clearly presented Gilkerson with a choice between agreeing to the rescission and term sheet, or being fired for cause. *E.g.* filing 57-6 at 4. For instance, when Gilkerson asked Appel whether his employment contract "means nothing," Appel replied,

> No. In their opinion you didn't live up to what your obligations were in this contract, which is to be – make this thing successful, make this thing work. . . . I'm going to tell you, you go ahead and go – If you're going to go to your lawyer, go to your lawyer, but you'll go to your lawyer without a job.

Filing 57-6 at 4. Appel warned Gilkerson that money was available for litigation, and that NCC could "outlast" Gilkerson. Filing 57-6 at 26. But Appel tried to persuade Gilkerson to accept the rescission and term sheet and continue working for NCC, asserting that he still believed Gilkerson could be successful and earn as much as he would have earned under the employment contract. *E.g.* filing 57-6 at 12. Appel also pointed out that it "would be tough" for Gilkerson to be unemployed, in part because Gilkerson had health problems and couldn't afford to lose his insurance. Filing 57-6 at 43. Appel told Gilkerson, "If I were in your shoes and if I'm thinking clearly, I'm saying, Wait a second. What's my alternative? 30 days from now I'm without a job. That's my alternative. Do I want that?" Filing 57-6 at 46-47. Appel agreed that he was "basically saying" that if Gilkerson did not sign the rescission, Gilkerson would be fired. Filing 57-6 at 29.

Gilkerson was able to briefly consult with counsel after the first meeting with Appel. Filing 51-1 at 5; *see* filing 57-6 at 31. But Gilkerson

---

[2] NCC objects to the proffered transcripts of those recordings, claiming they are unauthenticated hearsay. Filing 62 at 17. That objection is without merit. Appel's statements made during those meetings are clearly not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). And the standard at the summary judgment stage is not whether the evidence offered would be admissible at trial, "it is whether it *could* be presented at trial in an admissible form." *See,* Fed. R. Civ. P. 56(c)(2); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). There is no reason to believe that the recordings, or transcripts of the recordings, could not be properly authenticated and admitted at trial.

ultimately signed the rescission and term sheet on July 18, 2013. Filing 49 at 6. NCC fired Gilkerson on January 8, 2014. Filing 49 at 6. Gilkerson sued NCC in state court, alleging breach of contract and violation of the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1228 *et seq.*[3] Filing 1-1 at 26-30. After some procedural confusion that is no longer relevant, NCC eventually removed the case to this Court. Filing 1. Now before the Court is NCC's motion for summary judgment (filing 48).

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.[4] *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

---

[3] Gilkerson's Wage Payment and Collection Act Claim is, so far as the Court can tell, premised on NCC's alleged failure to pay Gilkerson compensation that would have been due under the employment contract. *See* filing 1-1 at 4-5. In other words, both of Gilkerson's claims rest on the validity of the employment contract and effect of the rescission, and need not be addressed separately.

[4] Gilkerson argues that, generally, there is an issue of material fact in this case because the deposition testimony of NCC's witnesses is not credible, and contradicts other evidence. Filing 54 at 7-8. But the Court has given Gilkerson the benefit of any contradiction, and his evidence is still insufficient to avoid summary judgment.

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## DISCUSSION

The primary issue presented in this case is whether the parties' rescission of Gilkerson's employment agreement is voidable as the product of duress. Duress is coercion that is wrongful as a matter of law. *City of Scottsbluff v. Waste Connections of Neb.*, 809 N.W.2d 725, 744 (Neb. 2011). Lawful coercion becomes impermissible when employed to support a bad-faith demand: one that the party asserting it knows (or should know) to be unjustified. *Id.*

To constitute duress, there must be an application of such pressure or constraint that compels a person to go against that person's will and takes away that person's free agency, destroying the power of refusing to comply with the unjust demands of another. *Bock v. Bank of Bellevue*, 434 N.W.2d 310, 315 (Neb. 1989); *Haumont v. Sec. State Bank*, 374 N.W.2d 2, 6 (Neb. 1985); *accord Lincoln Benefit Life Co. v. Edwards*, 45 F. Supp. 2d 722, 750 (D. Neb. 1999). But, "[t]o be voidable because of duress, an agreement must not only be obtained by means of pressure brought to bear, *but the agreement itself must be unjust, unconscionable, or illegal*." *Waste Connections*, 809 N.W.2d at 745 (emphasis supplied); *accord*, *Edwards*, 45 F. Supp. 2d at 750; *Kosmicki v. State*, 652 N.W.2d 883, 893 (Neb. 2002); *Bock*, 434 N.W.2d at 315; *Lustgarten v. Jones*, 371 N.W.2d 668, 672 (Neb. 1985); *Carpenter Paper Co. v. Kearney Hub Publ'g Co.*, 78 N.W.2d 80, 84 (Neb. 1956); *see First Data Res., Inc. v. Omaha Steaks Int'l*, 307 N.W.2d 790, 793 (Neb. 1981); *see also Gonzalez v. Union Pac. R.R. Co.*, 803 N.W.2d 424, 439 (Neb. 2011).[5] The essence of duress is the surrender to unlawful or unconscionable demands; it cannot be predicated upon demands which are lawful, or the threat to do that which the demanding party has the right to do. *Kosmicki*, 652 N.W.2d at 898; *Bock*, 434 N.W.2d at 315; *Lustgarten*, 371 N.W.2d at 672; *Carpenter Paper*, 78 N.W.2d at 84.

So, in *Omaha Steaks*, the Nebraska Supreme Court affirmed the dismissal on demurrer of the defendant's counterclaim for duress, because "the agreement, supposedly the result of pressure, must be either illegal,

---

[5] The Court is aware that generally, at common law, those requirements may be disjunctive: that is, duress might be found where either (1) a threat is so shocking that a court will not inquire into the fairness of the resulting exchange, or (2) the impropriety consists of the threat in combination with resulting unfairness. *See* Restatement (Second) of Contracts § 176 (Am. Law Inst. 1981). But that does not reflect Nebraska law, as promulgated by the Nebraska Supreme Court in *Carpenter Paper* and expressly reaffirmed in *Omaha Steaks*, *Lustgarten*, *Bock*, *Kosmicki*, and *Waste Connections*.

- 5 -

unjust, or unconscionable," and the defendant's answer had "in no way allege[d] that the amended agreement produced a contract the terms of which were either illegal, unjust, or unconscionable. Having failed to allege an essential element of the defense of economic duress or business coercion, the answer was subject to demurrer." 307 N.W.2d at 793. Similarly, in *Lustgarten*, the Court affirmed the dismissal of the plaintiffs' duress claim, finding both that the action characterized as duress was not coercive and that "[a]dditionally, there is no evidence that the [allegedly-voidable] agreement is unjust, unconscionable or illegal." 371 N.W.2d at 672. And in *Bock*, the Court affirmed a judgment against plaintiffs who had claimed they were compelled by duress to sign a guaranty and deeds of trust, because the "evidence is insufficient to show pressure or constraint . . . . Nor is the evidence sufficient to show that the guaranty and deeds of trust are unjust, unconscionable, or illegal." 434 N.W.2d at 315.

By contrast, in *McCubbin v. Buss*, the Nebraska Supreme Court found clear and convincing evidence of a voidable transaction where the plaintiff was compelled to cancel a stock purchase contract under threat of losing his job. 144 N.W.2d 175, 178 (Neb. 1966). The transaction was unjust because "the consideration for the discharge of the stock-purchase contract was inadequate." *Id.* at 179. In *Edwards*, this Court found that an agreement to repay a debt was voidable where an employee had been threatened with termination unless he signed it, because the agreement forced the employee "to repay a debt he did not owe due to [the employer's] fraud[,]" "had no relationship to his job performance," and was invalid due to fraudulent concealment. 45 F. Supp. 2d at 750. And in *Waste Connections*, the Nebraska Supreme Court affirmed the district court's finding that an agreement increasing the price the defendant charged the plaintiff for services was voidable because of duress, because the new rate was a 41 percent increase from a rate set only a month earlier, the new rate was not charged to any other customers, and there was no economic justification for charging the plaintiff more. 809 N.W.2d at 745-46.

In short, under Nebraska law, whether a contract is voidable as the product of duress depends not only on the coercion employed to produce the agreement, but whether the agreement "is itself unjust, unconscionable, or illegal." *Kosmicki*, 652 N.W.2d at 893. And there is nothing in this case to suggest that the agreement reached here—the rescission, and the term sheet that served as consideration for the rescission—was unjust, unconscionable, or illegal. In essence, Gilkerson accepted a reassignment: his title and employment responsibilities were changed, he received the same base salary but a different bonus structure, and he became an employee at will. Had the revised terms of his employment been given to a newly-hired employee, they

- 6 -

would certainly be seen as fair, or even generous. While Gilkerson might have seen it (reasonably) as a demotion, and the terms may have been less advantageous to him than the terms of his previous employment contract, they were not unjust, unconscionable, or illegal.

And Gilkerson really does not argue otherwise. The focus of his brief is arguing that the pressure brought to bear upon him to sign the rescission and term sheet was coercive. Filing 54 at 3-6. And with that, the Court does not disagree—there is, at least, a genuine issue of material fact as to whether the threat of termination would support a claim of duress. The parties have not presented the Court with much from which it could evaluate Gilkerson's job performance, which means that NCC, as the party moving for summary judgment, has not demonstrated that the threat to terminate Gilkerson's employment "for cause" under the employment contract was made in good faith. A factfinder could conclude that NCC had no sound basis to make that threat, and therefore that the threat was unlawfully coercive. But as explained above, under Nebraska law, that is not enough to void the subsequent rescission. NCC is entitled to summary judgment.

IT IS ORDERED:

1. The defendant's motion for summary judgment (filing 48) is granted.

2. The plaintiff's complaint is dismissed.

3. A separate judgment will be entered.

Dated this 31st day of May, 2016.

BY THE COURT:

John M. Gerrard
United States District Judge